UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                               :

KEILA PULINARIO,  ( 9 7 - G - 1 2 4 0 )         :

                    Petitioner,      :

       – against –               :

GLENN GOORD, Superintendent of     :
Bedford Hills Correctional Facility,
                               :
            Respondent.       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★   NOV.  5 2003   ★

P.M. _____
TIME A.M. _____

MEMORANDUM,
JUDGMENT & ORDER
02-CV-3681 (JBW)
03-MISC-0066 (JBW)

JACK B. WEINSTEIN, Senior District Judge:

I. Introduction

This case involves a homicide by a 21 year old woman with an I.Q. of 70 who shot her alleged rapist. With no prior criminal record she was sentenced to twenty-five years to life. It is appropriate, given this record, to grant the writ.

The trial court effectively precluded petitioner from making a well-founded defense of Post-Traumatic Stress Disorder (PTSD) and Rape Trauma Syndrome (RTS). It did so after allowing the defense to rely on an earlier ruling that the defense would be permitted. The change in ruling, made in mid-trial, cut the legs off the defense's theory after petitioner had been committed to it irretrievably. A fair trial was then impossible.

No hearing on this matter is necessary. The papers present the issues adequately. This memorandum addresses petitioner's claims and respondent's contentions.

II. History of Case

This petition was filed on June 17, 2002. Petitioner (sometimes referred to as defendant or appellant) claims:

Denial of statutory and constitutional right to present a defense when the trial court precluded expert testimony from the defense psychologist that appellant suffered from rape trauma syndrome and post-traumatic stress disorder when she shot the deceased, appellant's alleged prior rapist.

Expert testimony was originally ruled admissible, but after the appellant admitted she lied to the People's psychiatrist, the trial court ruled to limit appellant's expert witness. This ruling denied appellant's constitutional and statutory right to present a defense. This could have been avoided if the People would have conducted another examination of the appellant by the People's expert witness. In any event, the minor lies the appellant conceded to did not impair the People's expert from testifying. The lies were neither significant, nor material to the case. The defense had intended to include EED as a portion of her defense, and so told the jury in opening arguments, yet the trial court's limitation of her expert testimony later precluded this and undercut her defense. Thus, her justification defense and her defense that she lacked the intent to kill were severely compromised.

The people failed to prove appellant's intent to kill beyond a reasonable doubt. In addition, the People failed to disprove appellant's justification defense beyond a reasonable doubt.

The people relied on the testimony of a drug addict who had pending charges at the time of his testimony. Absent his testimony, the state relied on the appellant's statements which repudiate any conscious objective to cause the death of the victim. Appellant's statements which repudiate any conscious objective to cause the death of the victim. Appellant's exculpatory account, provided in both statements and through her direct testimony, was not discredited from other evidence provided by the People. The People did not present sufficient proof to disprove her justification defense or her intent to kill beyond a reasonable doubt.

The sentence imposed upon appellant was harsh and

2

excessive and should be modified in this interest of justice.

Appellant was 21 years old on the date of the instant
offense and had no prior criminal record. Her I.Q. was found to be
70 by the public schools and she was classified as learning disabled
and placed in special education classes. The defense's expert
witness Dr. Ledray wrote a letter to the trial court stating her
position that the appellant was raped by the victim and that her
subsequent behavior was the result of RTS and PTSD.
Furthermore, the District Attorney who prosecuted the case Janet
Albertson admitted in an interview with Court TV that a
"manslaughter plea would be a fair one." In light of this
admission, it is obvious that even the People had doubt as to the
appellant's intent to kill. The present 25 - life term is excessive in
light of the circumstances in this case and the many mitigating
factors.

Counsel for petitioner submitted an extensive brief with supporting documents on her

behalf in this court. Her statement of facts below is largely based on that brief. Materials

submitted by respondent are also extensive. The record includes eight full files. They include

letters on sentence which are not the basis for a decision in the instant proceeding, but suggest

the emotional background of the prosecution. One typical letter reads in part:

I am Raquel Pulinario-Rovelo. I am writing this letter
asking the court to please give my cousin Keila Pulinario a chance
to prove that she's not this horrible trouble making girl, cold
hearted killer that the jury and District attorney made everyone
believe. That she is a victim of rape and abuse. Keila [petitioner]
took the law into her own hands because all her life she has been
and experienced physical, mental and verbal abuse. I am not
condemning or saying that whet Keila did was right what I am
trying to say is that Keila probably thought that if she told anyone
what had happened to her no one would of listened like no one has
been listening to her all her life.

In my personal opinion the attorney that was assigned to
Keila's case Mr. John Ray was not a good capable attorney to
handle this type of case. I believe he knew this but he saw Keila
like everyone else does a vulnerable easy to convince person. He

3

took Keila's case for publicity and did not give her good reliable
legal advice. When speaking to Keila he should of spoke to her
like he was speaking to a young child not a young lady because
Keila doesn't have the knowledge of a young lady her age. If Mr.
Ray had only taken the time to look into Keila's past history or
school records he would of known that he was dealing with a
young girl who couldn't read, write or speak proper English. Keila
was a special education student who unbelievable but true was able
to graduate from school. A small example of how our school
system failed her and neglected her cries for help to her parents,
teachers, counselors, family and friends.

Mr. Ray never made Keila see that she could be where she
is now doing 25 to life. He always led her to believe that her case
was unique like no other. That by calling her case a "Rape Trauma
Syndrome" case she was going to be popular and make a new law
against victims like her. He never realized that a person with a
such a poor low level education doesn't know about laws or
sentencing. All Keila knew was that she had been raped and she
had committed a murder. She held on to Mr. Ray's advice and
believed in him, not realizing that a person with a such a poor low
level education doesn't know about laws or sentencing. All Keila
knew was that she had been raped and she had committed a
murder. She held on to Mr. Ray's advice and believed in him, not
realizing that what he was doing was taking her case for his own
publicity. He was more interested in seeing if he could make this
new so called law "Rape Trauma Syndrome" than he was
interested in seeing that Justice be done in demonstrating that she
was a victim not a cold hearted murderer.

When Keila began to "hang out" with the wrong crowd she
was just trying to demonstrate to her parents and everyone that
surrounded her that her behavior was an indication of her cries for
help, love, and attention. Very few of us in our family speak out
loud about our experience as victims of viewing domestic abuse at
a young age. Keila has always been a victim of society and was
scared and confused and decided that she was no longer going to
let those she trust hurt her. She became tired and led herself to
believe that no one cared and society was going to fail her once
more if she had not done what she did. I am not saying or
justifying that what she did was right but trying to say that Keila's
case was never tried in her also being a victim just about her being
murderer.

4

> I cannot speak for Mr. Santana [the deceased] but it is my understanding that at the time of the trial it was proven that he was a drug dealer and drug user. It was discussed that he had various types of drugs in his system when the autopsy was done. Mr. Santana had a previous sex offense charge pending and was a person who had been in jail for various crimes. Yet he was never sen as who he really was but as a young boy who's life was taken away by "ex-girlfriend" who set him up. He was never found guilty for his crime. Even though Mr. Santana was not a respectable person to society during the trial the District Attorney made him sound like he was the only victim in this case. There are many victim's in this case for example Keila, her family and friends, Mr. Santana, his family and friends we are all victim of this type of crime we all hurt in some way.
>
> Keila should be given a second chance in life and a chance to prove to herself and to everyone that she is not this horrible cold blooded murder she was described to be during her trial, but instead that she a wonderful, loveable, humble, giving person who was a victim of Mr. Santana and Society.
>
> I beg the court to give her a chance in appealing her case, in not failing her anymore. While in prison she has demonstrated to have all the characteristics I have mentioned before and has proven to be a role model prisoner. Keila has learned how to read, write and understand English while in prison with better knowledge then when she was tried and therefore now understands better what this appeal can mean to her life. Please give her a chance and hope and see that not everyone out there doesn't hear her cries or believes she not important.

The evidence supports the following statement:

On May 22, 1997 a jury convicted petitioner of one count of Murder in the Second

Degree (New York Penal Law § 125.25(1)) in the shooting death of Imagio Santana. On July 31,

1997, she was sentenced to a period of incarceration of 25 years to life, which she is presently

serving at the Bedford Hills Correctional Facility.

In Taylor v. Illinois, 484 U.S. 400, 417 n.23 (1988), the United States Supreme Court

5

held that preclusion of evidence offered by the defendant in a criminal trial is an "extreme"
sanction for a pre-trial discovery violation that should be restricted to cases of "'deliberate
contumacious or unwarranted disregard of the court's authority.'" (citation omitted). Here,
petitioner's right to present a defense under the Sixth Amendment to the United States
Constitution was claimed to have been violated when the trial judge, near the close of the defense
case, precluded petitioner from presenting psychiatric testimony supporting her defense that she
was suffering from PTSD and RTS when she shot Imagio Santana. The ruling was based on
petitioner's admission that she had given false information to the expert.

The essence of petitioner's defense at trial was that Imagio Santana had forced her to
have sex against her will. A few days later, when she confronted Santana about the rape, he,
according to her testimony, laughed at her and threatened to rape her again. Allegedly,
attempting to prevent a second attack, and still traumatized by the earlier rape, she shot Santana
and killed him. When Santana's body was found by the police, they found an open folding knife
nearby.

Prior to trial, the trial judge denied the prosecution's motion to exclude evidence
concerning the effect of PTSD and RTS on petitioner's mental state at the time of the shooting.
After nearly two weeks of testimony, the trial court reversed itself and precluded testimony from
the defense expert, Dr. Linda Ledray, that petitioner may have been suffering from PTSD at the
time she shot Imagio Santana. The trial judge also precluded testimony from Dr. Ledray
concerning RTS as an explanation for petitioner's conduct after the rape and her extreme fear of
Imagio that caused her to shoot him. The court held that preclusion was justified under New
York Criminal Procedure Law § 250.10(5) which required a defendant who raised a psychiatric

6

defense to cooperate fully during a court-ordered psychiatric examination by the prosecution's mental health expert. According to the judge, petitioner conceded that she violated § 250.10(5) when she testified on cross-examination that she was untruthful about certain aspects of her personal history to Dr. Robert Berger, the prosecution's mental health expert, during a psychiatric examination.

The trial court's preclusion order was, it is now claimed, an unjustified application of a serious sanction. It is undisputed that petitioner complied with § 250.10's requirement that a defendant timely notify the prosecution of its intent to offer psychiatric evidence. It is agreed that petitioner submitted to a five-and-one-half hour interview with Dr. Berger, the District Attorney's chosen psychiatrist. Dr. Berger was aware of petitioner's untruths, and exposed them in his written evaluation. He based his opinion that petitioner was malingering, in part, on her untruths. Petitioner took the stand in her own defense at trial; she was cross-examined extensively about her interviews with Drs. Berger and Ledray and her state of mind on the night of the shooting. The prosecution, it is petitioner's contention, had a full and fair opportunity to dispute her defense and was not prejudiced by her untruths.

In the absence of any prejudice, a preclusion order, in the face of petitioner's fundamental Sixth Amendment rights and the Supreme Court's decision in Taylor, was justified only if petitioner's purported failure to cooperate with the prosecution's mental health expert was "willful," in bad faith and motivated by a desire to obtain a tactical advantage. Arguably, studies of rape victims have shown untruths by rape victims, far from demonstrating their bad faith during a psychiatric examination, are a classic symptom of RTS – or so petitioner's expert might have explained to the jury. Because rape victims are, the evidence might have shown, often

7

overwhelmed by feelings of shame and embarrassment, and fear that their claims of rape will be greeted by skepticism (causing rape to be one of the most under-reported violent crimes in the United States), rape victims often lie about their relationship to the attacker, and conceal aspects of their personal history which they believe will cause others to dismiss their accusations. Courts in New York and elsewhere have permitted PTSD and RTS testimony to explain to juries why a rape victim might be untruthful about such matters, and such untruths can usually form no legal, much less logical, basis for precluding the testimony.

Here, the extreme sanction of preclusion imposed by the trial court was arguably inconsistent with petitioner's Sixth Amendment right to present a complete defense. The discrepancies between her trial testimony and her statements to the prosecution's psychiatrist were an appropriate subject for cross-examination, but did not rise to the level of a willful flouting of the court's authority that would justify wholesale preclusion of otherwise critical evidence.

Petitioner was 21 years old at the time she shot Imagio Santana. She had no prior criminal history. She had been sexually abused as a child. Imagio Santana was, the evidence could be construed as showing, a drug dealer who had pulled a knife. Without Dr. Ledray's testimony to rebut its arguments, the prosecution was permitted to thoroughly exploit the jurors' misconceptions about the conduct of rape victims and argue, among other things, that petitioner's seemingly calm demeanor after the rape and her untruths to the psychiatrists – which appear to be not untypical of rape victims – were evidence that she had not been raped.

At trial, petitioner testified that during her childhood and teenage years, she was the frequent victim of sexual and physical abuse. Between the ages of seven and eleven years old,

8

she was sexually abused by three older cousins and she was later physically abused by multiple boyfriends. (Tr. 1118, 1129, 1150-51).

The details of the long-time sexual relationship and particular sexual event - whether consensual or rape - are not critical to this proceeding. They are omitted from this memorandum.

On October 25, 1995, pursuant to New York Criminal Procedure Law § 250.10, the defense filed notice of its intent to offer psychiatric evidence at trial concerning the impact of Imagio's rape on petitioner's mental state at the time of the shooting. Section 250.10(1) defines the term "psychiatric evidence" to include:

(a)     Evidence of mental disease or defect to be offered by the defendant in connection with the affirmative defense of lack of criminal responsibility by reason of mental disease or defect.

(b)     Evidence of mental disease or defect to be offered by the defendant in connection with the affirmative defense of extreme emotional disturbance as defined in paragraph (a) of subdivision one of section 125.25 of the penal law . . . .

(c)     Evidence of mental disease or defect to be offered by the defendant in connection with any other defense not specified in the preceding paragraphs.

N.Y. Crim. Proc. Law § 250.10(1) (McKinney 2003).

The defense apparently intended to establish at trial that petitioner was suffering from PTSD and RTS when she shot Imagio and that, as a result of these conditions, she lacked criminal responsibility by reason of mental disease or defect or suffered from an extreme emotional disturbance at the time of the shooting, or that she was justified in shooting Imagio as an act of self-defense.

New York Penal Law § 40.15 provides that "it is an affirmative defense that when the defendant engaged in the proscribed conduct, he lacked criminal responsibility by reason of

9

mental disease or defect. Such lack of criminal responsibility means that at the time of such conduct, as a result of mental disease or defect, he lacked substantial capacity to know or appreciate either: (1) The nature and consequences of such conduct; or (2) That such conduct was wrong." N.Y. Penal Law § 40.15 (McKinney 2003).

To establish the defense of extreme emotional disturbance, petitioner was required to show that there was a "reasonable explanation or excuse for the emotional disturbance" and that "the conduct was influenced by an extreme emotional disturbance at the time the alleged crime was committed." People v. White, 79 N.Y.2d 900, 903 (1992); N.Y. Penal Law § 125(A)(1)(a).

Regarding the law of self-defense, New York Penal Law § 35.15(1) authorizes the use of physical force upon another person "when and to the extent he reasonably believes such to be necessary to defend himself or a third person from what he reasonably believes to be the use or imminent use of unlawful physical force by such other person." Section 35.15(2)(b) authorizes the use of deadly physical force where "[h]e reasonably believes that such other person is committing or attempting to commit a kidnaping, forcible rape, forcible sodomy or robbery." N.Y. Penal Law § 35.15.

If the jury accepted the "mental disease or defect" defense or the justification defense, petitioner was entitled to an acquittal. If the defense of extreme emotional disturbance was accepted by the jury, petitioner would be acquitted of Murder in the Second Degree and the jury would then have had the option to convict her of the less serious charge of Manslaughter in the First Degree. See N.Y. Penal Law § 125.25(1)(a).

Under New York Criminal Procedural Law § 250.10(3), "[w]hen a defendant . . . serves notice of intent to present psychiatric evidence, the district attorney may apply to the court, upon

10

notice to the defendant, for an order directing that the defendant submit to an examination by psychiatrist or licensed psychologist . . . designated by the district attorney." Under § 250.10(5), "[i]f the court finds that the defendant has willfully refused to cooperate fully in the examination ordered pursuant to subdivision three of this section it may preclude introduction of testimony by a psychiatrist or psychologist concerning mental disease or defect of the defendant at trial." N.Y. Crim. Pro. Law § 250.10(5).

In accordance with its notice pursuant to § 250.10, defense counsel retained Dr. Linda Ledray, a competent clinical psychologist, to examine petitioner and render a report on her psychiatric condition at the time she shot Imagio Santana. The prosecution, pursuant to Criminal Procedure Law § 250.10, retained Dr. Robert Berger, who was also a competent witness.

### Post-Traumatic Stress Disorder and Rape Trauma Syndrome

Post-traumatic stress disorder is a psychological reaction to an extreme traumatic event such as rape. See Robert L. Leahy & Stephen J. Holland, Treatment Plans and Interventions for Depression and Anxiety Disorders 181 (2000). Those suffering from PTSD are said to typically exhibit symptoms such as the re-experiencing of the trauma through memories, nightmares and flashbacks, feelings of numbness or detachment, and insomnia, irritability, impaired concentration, and hypervigilance. Id. The Diagnostic and Statistical Manual of Mental Disorders notes that "[t]he disorder may be especially severe or long lasting when the stressor is of human design (e.g. torture, rape)." See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 463 (4th ed. 2000). Courts in New York have recognized, in accordance with the SMI-IV, that rape is a stressor that may cause PTSD. See People v. Taylor, 75 N.Y.2d 277 (1990) (quoting American Psychiatric Association, Diagnostic &

11

Statistical Manual of Mental Disorders 247, 248 (3rd ed. 1987)). PTSD is an accepted ground for asserting a defense of extreme emotional disturbance under N.Y. Penal Law § 125.25 and a "mental disease or defect" defense under New York Penal Law § 40.15, the later of which, if accepted by a jury, constitutes a complete defense to a crime. See, e.g., People v. Rodriguez, 192 A.D.2d 465 (1st Dept. 1993); People v. Gabriel, 241 A.D.2d 835, 837 (3d Dept. 1997).

"Rape trauma syndrome" is a mental health term that describes the typical behavioral responses of rape victims. See AW Burgess & LL Holmstorm, Rape Trauma Syndrome, 131 Am. J. Psychiatry 981, 982 (1974). In the long term, victims suffer through nightmares and phobias that relate to the circumstances of the rape. Id. at 984.

Although experiencing common physical and emotional reactions to rape, Burgess and Holmstorm found that victims overtly respond to rape in different ways. Some victims exhibit an "expressed style" response, which is characterized by emotional behavior, such as crying, sobbing and feelings of anxiety. Other victims exhibit a "controlled style" response, where none of these symptoms are manifested, and the victim appears clam and rational, which might lead an uniformed observer to conclude that no rape has occurred. Id. at 982.

Rape is an under-reported crime. See, e.g., Rennison, Rape and Sexual Assault: Reporting to Police and Medical Attention 1992-2000 at 1 (Selected Findings, Bureau of Justice Statistics, August 2002) (approximately two-thirds of rapes are not reported to the police). Studies have shown that rape victims do not report rape, or delay in reporting, because of fear of mistreatment by police and hospital personnel, lack of support by family and friends, fear of rapist retaliation, and feelings of guilt and shame. See Pamela A. Wilk, Comment, Expert Testimony on Rape Trauma Syndrome: Admissibility and Effective Use in Criminal Rape

12

Prosecution, 33 Am. U.L. Rev. 417, 424 n.54 (1984); People v. Liberta, 64 N.Y.2d 152, 166 n.8
(1984) ("[t]he stigma and other difficulties associated with a woman reporting a rape and
pressing charges probably deter most attempts to fabricate an incident; rape remains a grossly
under-reported crime"), cert denied, 471 U.S. 1020 (1985).

A rape victim's fear that her accusations will be greeted with skepticism is particularly
acute where she knew the attacker or had a prior consensual sexual relationship. (See Letter
from Dr. Ledray to Hon. Gary Weber dated June 15, 1997, at 1-2 ("We also know from past
studies of rape victims that the better the victim knows the assailant the less likely she is to report
the rape.") ("Ledray June 15 Letter"). Studies have shown that a rape victim who has a prior
sexual relationship with her attacker is less likely to be believed by others and she may be blamed
for having brought the rape upon herself. See id. As the New York Court of Appeals observed
in People v. Taylor:

> Studies have shown that one of the most popular misconceptions
> about rape is that the victim by behaving in a certain way brought it
> on herself. For that reason, studies have demonstrated that jurors
> will under certain circumstances blame the victim for the attack
> and will refuse to convict the man accused. Studies have also
> shown that jurors will infer consent where the victim has engaged
> in certain types of behavior prior to the incident.

Taylor, 75 N.Y.2d at 288-89 (citation omitted).

Many rape victims, in light of these popular misconceptions, delay in reporting a rape or
falsely deny a prior relationship with their attacker. See People v. Bennett, 79 N.Y.2d 464
(1992) (citing studies that have found that a rape victims's behavior following the assault "may
seem unusual -- such as remaining calm and composed, failing to report the incident immediately,
or falsely claiming not to know the attacker - - but nevertheless may not be an unusual response

13

to the attack"). Other rape victims may be untruthful about where the rape occurred and the

circumstances of the rape, or even deny being raped. People v. Whitehead, 142 A.D.2d 745 (3d

Dept. 1988) (RTS may cause a victim to deny being raped); Simmons v. State, 504 N.E.2d 575,

578-79 (Ind. 1987) (victim's falsehoods to police about the circumstances of the rape and her

conduct afterwards were consistent with rape trauma syndrome); State v. Horne, 710 S.W.2d

310, 312 (Mo. Ct. App. 1986) ( rape victims may not be entirely forthcoming because they "are

upset and they're reluctant to talk about everything that happened").

Had Dr. Ledray been allowed to testify at trial concerning petitioner's mental condition at

the time of the shooting, arguably she would have testified that it is not uncommon for rape

victims to tell untruths and withhold information because they feel that "others will judge them

and not believe they were raped  . . . . If they were doing something illegal, or something they

believe may be used against them, they will often leave these details out to prevent additional

blame and shame." (Exhibit A, Petitioner's Brief in Appellate Division, at A22).

Because rape victims often act in such counter-intuitive ways, and because jurors may

misconceive such behavior as evidence that the victim was not raped, the New York Court of

Appeals in Taylor held that expert testimony concerning RTS is admissible to explain the

conduct of rape victims. In Taylor, the complainant did not immediately report the rape to law

enforcement and lied to the police about her relationship to her attacker on two separate

occasions by denying a prior association with her assailant although the complainant had actually

known defendant for years and had seen him the night before the attack. See Taylor, 75 N.Y.2d

at 282-83. The court admitted expert testimony concerning RTS because it would help the jury

understand that "a rape victim who knows her assailant is more fearful of disclosing his name to

14

the police and is in fact less likely to report the rape at all." Id. at 292.  Courts have admitted

RTS testimony to explain the conduct of rape victims both in cases where the rape victim is the

complainant, as well as in cases where the victim is the defendant who is accused of a crime

against her attacker.  See, e.g., People v. Matthews, 91 Cal. App.3d 1018 (Cal. Ct. App. 1979).

### Dr. Ledray's Examination and Report

On March 4, May 10 and May 14, 1996, petitioner was interviewed and tested by Dr.

Ledray and her staff.  In connection with her examination, Dr. Ledray reviewed, inter alia,

written summaries of petitioner's statements to the Suffolk County police and autopsy reports of

Imagio Santana.  As Dr. Ledray summarized the matter in her written report of her examination,

dated May 18, 1996, she was made aware of the relevant facts concerning petitioner's conduct

both before and after Imagio's shooting.

During the interview, petitioner disclosed to Dr. Ledray troubling aspects of her personal

history.  She informed Dr. Ledray that she was put into special education classes in the fourth

grade and was identified as having learning disabilities.  She also disclosed to Dr. Ledray that

when she was seven years old, she was sexually assaulted by three older cousins who lived

downstairs from her family.  Two cousins touched her inappropriately and a third one raped her.

She was so afraid, she did not tell anyone about the sexual assault.  She described her family as

one in which they "protected each other" by not disclosing to each other traumatic events like

rape but kept them a secret.  (Exhibit A, Petitioner's Brief in Appellate. Division A19-24).  She

was untruthful to Dr. Ledray and denied she had a prior sexual relationship with Imagio.  (Id. at

25).

Dr. Ledray, following the completion of her interviews and testing, concluded that

15

petitioner had "severe psychological problems": As a result of the rape in September 1995, petitioner was diagnosed with PTSD and Major Depressive Disorder and "the testing completed by petitioner indicated a consistent pattern across measures of high level of depression [,]... fear ... [and] anxiety." Petitioner's "severe psychological problems" manifested themselves in part through an extreme mistrust of others, such that it "will make it very difficult for a therapist to gain her confidence." Dr. Ledray explained that petitioner's conduct, including her delay in reporting the rape to the police, her desire to meet with Imagio to seek an explanation for the rape, and her fear that Imagio intended to rape her a second time which caused her to shoot him, where all consistent with the typical reactions of a rape victim suffering from PTSD. According to Dr. Ledray, rape victims like petitioner often blame themselves for the rape, feel ashamed and embarrassed, and fear they will not be believed. (Id.)

### Examination and Report by Dr. Robert H. Berger

The District Attorney, pursuant to New York Criminal Procedure Law § 250.10(3), retained Dr. Robert H. Berger. He interviewed petitioner in the presence of an Assistant District Attorney and two prison guards for a total of five and a half hours. In connection with his evaluation, Dr. Berger interviewed Imagio's sisters, Zuleica and Xiomara, and reviewed the Ledray Report and the results of the tests administered by Dr. Ledray. Dr. Berger administered no psychological tests of his own. Following his interviews, he rendered a written report on November 12, 1996.

As with Dr. Ledray, petitioner was not truthful with Dr. Berger about her prior sexual relationship with Imagio. Although she disclosed to Dr. Berger that she had been sexually active since the seventh or eight grade, petitioner minimized her prior sexual relationship with Imagio

16

and reported to Dr. Berger that she had engaged in consensual sex with Imagio on only one occasion.

This falsity was exposed by Dr. Berger. He observed that petitioner had informed the police that she and Imagio "would see each other and that they would have sex a lot, not an everyday thing, but once a month." Petitioner's sexual relationship with Imagio was a lengthy topic of Dr. Berger's interviews with Imagio's sisters, who "stated that the defendant and [Imagio] began to have sexual relations about four to five years ago and . . . estimate[d] that the two had sex together at least twenty to thirty times in many different places." (Exhibit B Petitioner's Brief in Dr. Berger's Letter at B5-23)

In light of this exposed untruth, and his suspicion of others, Dr. Berger devoted his report to demonstrating that petitioner was a malingerer, consciously feigning and simulating her mental disorder. In addition to exposing petitioner's false statement about her sexual relationship with Imagio, Dr. Berger questioned her truthfulness with respect to her prior drug history and her conduct after the rape. Dr. Berger devoted much of his report to an extensive discussion of petitioner's initial untruthfulness to the police when she was questioned about her role in Imagio's shooting.

Dr. Berger criticized petitioner's cooperativeness during the examination. He described her as a "superficially cooperative" examinee who "attempts to present herself in a favorable light, and whenever possible highlights the traumatic experience of the alleged rape." According to Dr. Berger her responses on Dr. Ledray's tests indicated that she was responding in an "exaggerated manner, endorsing a variety of inconsistent symptoms and attitudes." Dr. Berger expressed skepticism regarding some of petitioner's responses that she did not know or

17

remember an answer to a question, "when it seemed rather that she did not wish to answer the question." (Id. at 16). Based on these observations, Dr. Berger concluded that petitioner was a malingerer and that he disagreed with Dr. Ledray's diagnosis of Post-Traumatic Stress Disorder. (Id. at 23-23). Dr. Berger did not report that his conclusions were compromised by petitioner's falsehoods or by her purported lack of cooperativeness.

On December 9, 1996, the District Attorney filed a motion *in limine* to preclude the defense from presenting expert testimony at trial concerning PTSD or RTS, or in the alternative, for an order directing the defense to establish the admissibility of such testimony at a hearing pursuant to Frye v. United States, 293 F. 1013 (D.C. Cir. 1923). Although Drs. Berger and Ledray had made their findings by that point - - including Dr. Berger's finding that petitioner was untruthful during the examination - - the District Attorney did not move to preclude the defense from presenting psychiatric evidence under New York Criminal Procedure Law § 250.10(5) on the ground that petitioner had "willfully refused to cooperate fully" in his examination.

The defense opposed the prosecution's motion. It intended to present PTSD testimony in support of its defenses that petitioner was not criminally responsible for Imagio's death due to mental disease and defect under New York Penal Law § 40.15, that she was acting under an extreme emotional disturbance on the date of the shooting, and that she was justified in shooting Imagio because she reasonably feared that a second rape was imminent under New York Penal Law § 35.15. Moreover, the defense intended to present testimony concerning RTS to dispel juror misconceptions about rape victims, and to explain to jurors why a rape victim like petitioner might delay in reporting the rape to the police, behave in a seemingly rational manner in seeking an explanation for the rape from Imagio, and fail to be completely truthful about her

18

personal history, including her prior sexual relationship with Imagio, when describing the rape to mental health experts.

In a decision dated February 26, 1997 the trial court denied the District Attorney's motion *in limine* and found Dr. Ledray's testimony admissible. It held that "[t]estimony concerning Rape Trauma Syndrome as well as Post Traumatic Stress Disorder has been admitted in numerous reported cases in New York and has been ruled to satisfy the admissibility requirements of Frye." In its opinion, the court indicated that it had reviewed the Berger Report, which was the only document submitted by either party which made reference to petitioner's sexual relationship with Imagio. In a reference to the Berger Report, the court noted that "in the motion papers at least, there are indications that the defendant had engaged in consensual sex on numerous occasions with the decedent." Feb. 26, 1997, Decision and Order, Appellant's Brief at A3a-5.

### The Trial

The case proceeded to trial in May 1997. The prosecution's theory of the case was that petitioner was never raped by Imagio but that she had used the allegation of rape as part of a calculated plan to regain the affection of her former boyfriend, Amauris Figueroa, who had heard that petitioner and Imagio had engaged in consensual sex. (Tr. 39-49, 58-59). In support of its argument to the jury that petitioner was never raped by Imagio, the prosecution argued that she and Imagio had previously engaged in consensual sex, that she appeared to act calmly and deliberately in confronting Imagio about the rape, and that she did not appear to be in a "state of shock" when she killed Imagio. (Tr. 38, 45).

The defense's theory was premised on the trial court's February 26 Decision and its

19

expectation that Dr. Ledray would testify at trial. Relying on Dr. Ledray's psychiatric testimony, the defense determined that it would not contest the prosecution's most incriminatory factual allegations. Thus, the defense did not contest that petitioner brought a gun to her meeting with Imagio on the night of September 19, 1995, that she lied to Imagio about a drug sale in order to persuade him to leave his home, that she fired the shots that killed Imagio, and that she had the gun when she was with Amauris after the shooting. (Tr. 72-77). Anticipating that Dr. Ledray's testimony would help dispel the jurors' misconceptions about the behavior of rape victims, the defense conceded in its opening statement that petitioner was untruthful during her examinations by Drs. Ledray and Berger. (Tr. 80). Despite this clear admission by the defense, neither the District Attorney, nor the court, suggested at this point that preclusion of Dr. Ledray's testimony would be appropriate.

Proceeding through the prosecution's presentation of its evidence, and through most of its own witnesses, the defense was given no reason to expect that either the court or the prosecution would seek to preclude Dr. Ledray's testimony based on any purported uncooperativeness by petitioner during Dr. Berger's examination. To lay the necessary factual predicates for Dr. Ledray's testimony, petitioner waived her Fifth Amendment right to remain silent and took the witness stand to testify to the circumstances of the rape and shooting.

During her direct examination, petitioner testified to her childhood friendship with Imagio, their sexual relationship, the rape by Imagio , her depression and suicide attempt after the rape, and her extreme fear that Imagio was going to rape her again prior to the shooting. (Tr. 116-17, 1135-38, 1157-61, 1183-84). She also acknowledged that she was mistrustful of Drs. Ledray and Berger during her examinations, particularly of Dr. Berger, who interviewed her

20

while she was in handcuffs and shackles. (Tr. 1189-90, 1203-06).

During a recess near the close of the direct examination, the defense counsel, outside the presence of the jury, raised the issue of preclusion with the trial judge. Based on certain "hints" that he had heard, defense counsel was concerned that Dr. Ledray's testimony might be precluded and he thus inquired of the court whether there were any issues that needed to be addressed in anticipation of Dr. Ledray's testimony. (Tr. 1198-99). The trial judge informed the defense that he, at that point, was not expecting to preclude Dr. Ledray and the District Attorney stated that she "d[i]dn't see why [Ledray's] not going to testify." (Tr. 1200). The prosecution gave no indication that it considered petitioner's untruths to Dr. Berger a basis on which to preclude Dr. Ledray's testimony.

On cross-examination by the District Attorney, petitioner reconfirmed her testimony on direct that she was mistrustful of Drs. Ledray and Berger. (Tr. 1236-37). Because of this mistrust, petitioner testified that she was untruthful to Drs. Ledray and Berger about the extent of her prior sexual relationship with Imagio. (Tr. 1228-29, 1236-37). When the District Attorney questioned petitioner about other discrepancies between her testimony at trial and her statements to Dr. Berger, she testified that she was not truthful with him about her prior drug use and conduct after the rape. (Tr. 1316-17, 1341, 1365). The District Attorney repeatedly used this admission to obtain multiple concessions from petitioner that she had not told Drs. Ledray and Berger the truth about "everything." (Tr. 1360).

On re-direct, petitioner acknowledged that she was untruthful to Drs. Ledray and Berger about her sexual relationship with Imagio because she did not trust them and she had a "hard time talking about" that subject. (Tr. 1429, 1432). She testified that she answered all of Dr.

21

Ledray's and Berger's question to the "best of [her] ability." (Tr. 1429).

Following petitioner's testimony, the District Attorney - - for the first time - - moved to preclude Dr. Ledray's testimony under Criminal Procedure Law § 250.10(5). The District Attorney provided no explanation of why it waited to make this motion until the eve of Dr. Ledray's testimony when the basis for its motion - - petitioner's untruthfulness to Dr. Berger - - had been known by the prosecution since at least as early as November 1996, when Dr. Berger's interviewed petitioner. (Tr. 1204). Nearly two weeks earlier, during its opening statement, the defense had conceded that petitioner was untruthful without any suggestion by the prosecution at that point that it would seek to preclude Dr. Ledray's testimony. (Tr. 80). The prosecution also gave no hint of its motion when the defense raised the issue of preclusion shortly prior to petitioner's cross-examination. (Tr. 1200).

The defense, in opposition to the prosecution's motion, argued that it would be improper to preclude petitioner's testimony based on her untruthfulness to Drs. Berger and Ledray. According to the defense, those purported falsehoods - - concerning petitioner's sexual history with her attacker, her prior drug use and conduct after the rape - - were the symptoms of the very psychiatric problem it would establish through Dr. Ledray, who had observed petitioner testify during her cross-examination and heard petitioner admit that she was untruthful. The doctor for the defense was prepared to testify on petitioner's behalf. (Tr. 1270, 1468). According to the defense:

> The expert will testify that the failure to be forthcoming
> completely, indeed when lies are told regarding sexual encounters
> involving rape, that that is a typical, not an atypical, that is a
> consistent behavior with rape trauma syndrome. In fact, it is
> something that – that is profoundly exhibited by rape trauma

22

> victims. They don't – they feel that people won't believe them so
> they don't talk about he – they don't give the entire picture about
> the sex that they may have had with the acquaintance in an
> acquaintance rape situation. These are things that are standard, not
> the opposite. So when you put that together, the expert may be
> able to explain that to a jury just as Keila attempted to explain to
> this Court the reason for saying what she said.

(Tr. 1490-91). The defense argued that petitioner's fear that her claim of rape by a former

sexual partner would not be believed, and the desire to minimize negative aspects of her personal

history to enhance her credibility, were classic symptoms of RTS that needed to be explained to

the jury. (Tr. 1468-69). Holding a defendant who suffered from RTS and had "severe

psychological problems" (Exhibit B at 29) to a standard of perfect truthfulness (which might

otherwise be expected of a person who was not suffering from RTS and PTSD) was irrational.

(Tr. 1495). Because petitioner suffered from "severe psychological problems" and because her

untruthfulness and mistrust of others were classic symptoms of RTS, the defense argued that

there was no "willful" failure to cooperate under the terms of Criminal Procedure Law §

250.10(5).

The court on May 19, 1997, issued a Decision and Order ("May 19 Decision") rejecting

the defense's contentions. Finding that petitioner had lied to Dr. Berger "throughout" the pre-

trial examination because she did not trust him, and had also lied to Dr. Ledray, the court held

that petitioner "willfully refuse[d] to cooperate fully in the examination." May 19, 1997,

Decision and Order, Appellant's Brief at A6-7. The court ordered that the entirety of Dr.

Ledray's testimony concerning PTSD would be precluded. Concerning RTS, the court confined

Dr. Ledray's testimony to a general explanation of how RTS might affect a delay in reporting a

rape by a rape victim. (Id.) The trial judge did not mention any alternative remedies or

23

sanctions, such as ordering a continuance to give Dr. Berger an opportunity to revise his diagnosis in light of any new information revealed during petitioner's cross-examination, or specifically instructing the jury that it should consider petitioner's untruthfulness to Drs. Berger and Ledray in assessing the overall credibility of Dr. Ledray's and petitioner's testimony.

At the conclusion of petitioner's testimony, Dr. Ledray took the witness stand. She was permitted only to testify generally about why a rape victim might delay in reporting a rape, without relating it at all to petitioner's personal situation. (Tr. 1566-69). She was not allowed to testify at all that petitioner was suffering from PTSD at the time of the shooting and the impact of that mental state, which was central to petitioner's defense. Nor was Dr. Ledray allowed to explain to the jury, inter alia, that petitioner's untruthfulness with the mental health experts was a typical reaction of a rape victim who fears that aspects of her personal history will diminish her credibility. Because Dr. Ledray was unable to testify that petitioner was suffering from PTSD at the time of the shooting, the defense was unable to pursue its defense of mental disease or defect under Penal Law § 40.15, and determined that it could not ask the jury to consider the defense of extreme emotional disturbance. Petitioner's justification defense - - which was premised on her impaired mental state and extreme fear that Imagio was attempting to rape her again on September 19, 1995 - - was also seriously undermined by the exclusion of Dr. Ledray's testimony concerning PTSD.

As a result of the preclusion of Dr. Ledray's testimony concerning PTSD and RTS, the prosecution was free to exploit possible juror misconceptions about rape victims. Notwithstanding numerous studies that have shown that women are frequently raped by former sexual partners (Exhibit A at A20), the prosecution argued to the jury that petitioner's former

24

consensual sexual relationship with Imagio was evidence that she had not been raped:

> What you know is – is that she had been having sex with [Imagio]
> since junior high school until the age she was eighteen, . . . or
> nineteen. He's never raped her, he never hurt her in any way.

(Tr. 1748). Notwithstanding numerous studies that have shown that rape victims often lie abut
their personal history because they fear that their claims of rape will be greeted by skepticism, the
prosecution agreed to the jury that petitioner lied "with impunity" to get away with the crime.
(Tr. 1745). Although rape victims often appear seemingly calm and rational after a rape, the
prosecution argued that petitioner's calm behavior after the rape was inconsistent with that of a
rape victim. (Tr. 1739-40). According to the prosecution, petitioner's claim that she was raped
was unworthy of belief because she did not behave like a "traumatized" person. (Tr. 1757).

On May 22, 1997, the jury returned a guilty verdict of intentional second-degree murder.
Defense counsel at that point "move[d] to set aside the verdict . . . [because] it could not possibly
be based on the sufficiency of the evidence." (Tr. 1925). The court denied the motion. On July
31, 1997, petitioner was sentenced to a term of 25 years to life in person.

On February 13, 2001, the Appellate Division affirmed her conviction and sentence in all
respects. People v. Pulinario, 280 A.D.2d 558 (2d Dept. 2001). Without any specific reference
to petitioner's federal constitutional claims, the Appellate Division held that: (a) the trial court
properly limited Dr. Ledray's testimony based upon petitioner's admission that she lied to Dr.
Berger; (b) petitioner's challenge to the sufficiency of evidence was "unpreserved for appellate
review and, in any event, without merit" and that "the verdict of guilt was not against the weight
of the evidence;" and (c) the "sentence was not excessive." Id.

25

On February 26, 2001, pursuant to New York Criminal Procedure Law § 460.20, petitioner by way of letter, requested permission to appeal to the New York Court of Appeals. The February 26 letter informed the Court of Appeals that "Appellant is appealing from each and every issue in [her] appeal to the Appellate Division." The Court of Appeals denied petitioner's application. It held that "upon the record and proceedings herein, there is no question of law presented which ought to be reviewed by the Court of Appeals and permission is hereby denied." People v. Pulinario, 96 N.Y.2d 833 (2001).

While there is a contention that petitioner's claim respecting the limitation on the defense expert's testimony has not been exhausted, it seems obvious that it has been exhausted. There is no claim of lack of timeliness. *See* 28 U.S.C. § 2244 (d)(1). There is no procedural bar. Counsel was effective. The issue of preclusion is ripe for review.

### III. AEDPA

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant a writ of habeas corpus to a state prisoner on a claim that was "adjudicated on the merits" in state court only if it concludes that the adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

An "adjudication on the merits" is a "substantive, rather than a procedural, resolution of a federal claim." Sellan v. Kuhlman, 261 F.3d 303, 313 (2d Cir. 2001) (quoting Aycox v. Lytle,

196 F.3d 1174, 1178 (10th Cir. 1999)). Under the "contrary to" clause, "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412–13 (2000) (O'Connor, J., concurring and writing for the majority in this part). Under the "unreasonable application" clause, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. Under this standard, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. In order to grant the writ there must be "some increment of incorrectness beyond error," although "the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000) (internal quotation marks omitted).

"[F]ederal law, as determined by the Supreme Court, may as much be a generalized standard that must be followed, as a bright-line rule designed to effectuate such a standard in a particular context." Overton v. Newton, 295 F.3d 270, 278 (2d Cir. 2002); see also Yung v. Walker, No. 01-2299, 2002 U.S. App. LEXIS 28137 (2d Cir. Aug. 1, 2003) (amended opinion) (district court's habeas decision that relied on precedent from the court of appeals is remanded for reconsideration in light of "the more general teachings" of Supreme Court decisions). The Court of Appeals for the Second Circuit has also indicated that habeas relief may be granted if a

27

state court's decision was contrary to or an unreasonable application of "a reasonable extension" of Supreme Court jurisprudence. Berbary v. Torres, No. 02-2463, 2003 U.S. App. LEXIS 16167, at *25 (2d Cir. Aug. 7, 2003). Determination of factual issues made by a state court "shall be presumed to be correct," and the applicant "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

IV. Exhaustion

In the past, a state prisoner's federal habeas petition had to be dismissed if the prisoner did not exhaust available state remedies as to any of his federal claims. See Rose v. Lundy, 455 U.S. 509, 522 (1989). "This exhaustion requirement is . . . grounded in principles of comity; in a federal system, the States should have the first opportunity to address and correct alleged violations of [a] state prisoner's federal rights." Coleman v. Thompson, 501 U.S. 722, 731 (1991). The exhaustion requirement requires the petitioner to have presented to the state court "both the factual and legal premises of the claim he asserts in federal court." Daye v. Attorney General, 696 F.2d 186, 191 (2d Cir. 1982) (en banc).

Pursuant to AEDPA, a district court may now, in its discretion, *deny* on the merits habeas petitions containing unexhausted claims—so-called "mixed petitions." See 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the state."). In addition, the state may waive the exhaustion requirement, but a "State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement." Id. §

28

2254(b)(3); see also Ramos v. Keane, No. 98 CIV. 1604, 2000 U.S. Dist. LEXIS 101, at *10

(S.D.N.Y. 2000) (state's failure to raise exhaustion requirement does not waive the issue).


V.  Procedural Bar

A federal habeas court may not review a state prisoner's federal claims if those claims

were defaulted in state court pursuant to an independent and adequate state procedural rule,

"unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the

alleged violation of federal law, or demonstrate that failure to consider the claims will result in a

fundamental miscarriage of justice." Coleman, 501 U.S. at 750.  In determining whether a

procedural bar is sufficient to preclude habeas review, a federal court must consider as

"guideposts" the following:

> (1) whether the alleged procedural violation was actually relied on in the trial
> court, and whether perfect compliance with the state rule would have changed the
> trial court's decision; (2) whether state caselaw indicated that compliance with the
> rule was demanded in the specific circumstances presented; and (3) whether
> petitioner had "substantially complied" with the rule given "the realities of trial,"
> and, therefore, whether demanding perfect compliance with the rule would serve a
> legitimate governmental interest.

Cotto v. Herbert, 331 F.3d 217, 240 (2d Cir. 2003) (quoting Lee v. Kemna, 534 U.S. 362

(2002)).

If a state court holding contains a plain statement that a claim is procedurally barred then

the federal habeas court may not review it, even if the state court also rejected the claim on the

merits in the alternative.  See Harris v. Reed, 489 U.S. 255, 264 n.10 (1989) ("a state court need

not fear reaching the merits of a federal claim in an *alternative* holding" so long as it explicitly

invokes a state procedural rule as a separate basis for its decision).

When a state court says that a claim is "not preserved for appellate review" and then rules "in any event" on the merits, such a claim is not preserved. See Glenn v. Bartlett, 98 F.3d 721, 724–25 (2d Cir. 1996). When a state court "uses language such as 'the defendant's remaining contentions are either unpreserved for appellate review or without merit,' the validity of the claim is preserved and is subject to federal review." Fama v. Comm'r of Corr. Svcs., 235 F.3d 804, 810 (2d Cir. 2000). Where "a state court's ruling does not make clear whether a claim was rejected for procedural or substantive reasons and where the record does not otherwise preclude the possibility that the claim was denied on procedural grounds, AEDPA deference is not given, because we cannot say that the state court's decision was on the merits." Su v. Filion, No. 02-2683, 2003 U.S. App. LEXIS 13949 at *15 n.3 (2d Cir. July 11, 2003) (citing Miranda v. Bennett, 322 F.3d 171, 178 (2d Cir. 2003)). This congeries of holdings leaves it an open question whether there are "situations in which, because of uncertainty as to what the state courts have held, no procedural bar exists and yet no AEDPA deference is required." Id.

VI. Errors of State Law

Federal habeas corpus relief does not lie for mere errors of state law. Estelle v. McGuire, 502 U.S. 62, 68 (1991). Nonetheless, the Due Process Clause requires that state courts conducting criminal trials "proceed consistently with 'that fundamental fairness' which is 'essential to the very concept of justice.'" Dunnigan v. Keane, 137 F.3d 117, 125 (2d Cir. 1998) (quoting Lisenba v. California, 314 U.S. 219, 236 (1941)). Errors of state law that rise to the level of a constitutional violation may be corrected by a habeas court, but even an error of constitutional dimensions will merit habeas corpus relief only if it had a "'substantial and

30

injurious effect or influence in determining the jury's verdict.'" <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 623 (1993) (quotation omitted).


VII. Evidentiary Error

For a habeas petitioner to prevail on a claim that an evidentiary error amounted to a deprivation of due process, he must show that the error was so pervasive as to have denied him a fundamentally fair trial. <u>United States v. Agurs</u>, 427 U.S. 97, 108 (1976). The standard is "whether the erroneously admitted [or excluded] evidence, viewed objectively in light of the entire record before the jury, was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it. In short it must have been 'crucial, critical, highly significant.'" <u>Collins v. Scully</u>, 755 F.2d 16, 19 (2d Cir. 1985) (quoting <u>Nettles v. Wainwright</u>, 677 F.2d 410, 414–15 (5th Cir. 1982). This test applies post-AEDPA. <u>See</u> <u>Wade v. Mantello</u>, No. 02-2359, slip op. at 13 (2d Cir. June 13, 2003).


VIII. Harmless Error

In order to be entitled to habeas relief, a petitioner must demonstrate that any constitutional error "had substantial and injurious effect or influence in determining the jury's verdict," and that the error resulted in "actual prejudice." <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993) (quotation marks omitted).

When a claim was never adjudicated on the merits in the state courts and there is no ruling which commands AEDPA deference, it is unclear what the standard for review for harmlessness should be in a collateral attack when a federal court finds constitutional error.

31

Should it proceed under the "beyond a reasonable doubt" standard of <u>Chapman v. California</u>, 386

U.S. 18 (1967) (conviction infected by constitutional error must be overturned unless "harmless

beyond a reasonable doubt") or under the "substantial and injurious effect or influence" standard

of <u>Brecht</u> (for cases on collateral review, an error is generally considered harmless if it did not

have a "substantial and injurious effect or influence in determining the jury's verdict")? The

correct standard of review is an open question in this circuit. <u>See</u> <u>Cotto v. Herbert</u>, No. 01-2694,

2003 U.S. App. LEXIS 8326, at *92 (2d Cir. May 1, 2003).

IX. Analysis of Claims

### A.

The claim that proof beyond a reasonable doubt was not adduced has no merit. There

was ample evidence of an intentional killing.

### B.

The sentence, though harsh, was permitted by New York law. No federal issue on this

ground is presented.

The claim has no merit.

### C.

The petitioner plausibly claims that she was precluded from defending her case by an

unreasonable interpretation of New York law and an abuse of trial court discretion limiting

defendant's expert from testifying effectively.

The Sixth Amendment to the United States Constitution provides that every criminal

defendant has "the right to . . . have compulsory process for obtaining witnesses in his favor."

32

U.S. Const. amend. VI. Because the right to compel a witness's presence in the courtroom cannot protect the "integrity of the adversary process if it did not embrace the right to have the witness's testimony heard by the trier of fact," the Sixth Amendment accords defendants the right to present witnesses, which has been deemed a "fundamental element of due process of law." See Taylor v. Illinois, 484 U.S. 400, 408 (1988) (internal quotation marks and citation omitted); Michigan v. Lucas, 500 U.S. 145, 149 (1991). This right is incorporated in the Fourteenth Amendment and applies to state court proceedings. Washington v. Texas, 388 U.S. 14, 19 (1967).

A defendant's constitutional right to present evidence is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process. Taylor, 848 U.S. at 411. Thus, for example, "[t]he State's interest in the orderly conduct of a criminal trial is sufficient to justify the imposition and enforcement of firm, though not always inflexible, rules relating to the identification and presentation of evidence." Id.

Preclusion as a sanction for the violation of a state procedural rule, is "extreme" and conflicts with the essential purpose of the compulsory Process Clause, which is to ensure that judgments are not "founded on a partial or speculative presentation of the facts." Id. at 417 n.23. The exclusion of vital criminal defense evidence deliberately distorts the record at the risk of misleading the jury into convicting an innocent person. See United States v. Nixon, 418 U.S. 682, 709 (1974).

Because preclusion is an "extreme" and drastic sanction, it is constitutionally permissible only under the most egregious circumstances, "where the uncooperative party demonstrates a deliberate contumacious or unwarranted disregard of the court's authority." See Taylor, 484 U.S.

33

at 417 n.23 (favorably citing an Illinois state court decision )(citation and internal quotation marks omitted). In Taylor, the Court affirmed the preclusion of a defendant's witnesses where defense counsel failed to identify his witnesses in a timely manner in response to a prosecution motion, misrepresented to the trial court that he had just recently learned of the witness's identity, misled the court as to the relevance of their testimony, and attempted to mislead the prosecution by identifying certain witnesses on the eve of trial that he had no intention of calling. Id. at 403-05. According to the Supreme Court, defense counsel's conduct constituted a "willful" violation of state discovery rules done deliberately to "obtain a tactical advantage." Id. at 415.

Although prejudice to the prosecution should ordinarily be considered in assessing the propriety of a preclusion sanction, the Court held that no such analysis was necessary in Taylor because "it is plain that the case fits into the category of willful misconduct in which the severest sanction is appropriate." Id. at 417. The Taylor Court's analysis of the defendant's "willfulness" in terms of whether the defendant acted in bad faith or to gain a tactical advantage was consistent with the Court's general definition of that term. See Screws v. United States, 325 U.S. 91, 101 (1945) (an act is done willfully if it is done "with a bad purpose" or "evil motive"); Noble v. Kelly, 89 F. Supp.2d 443, 457 (S.D.N.Y. 2000) (defendant did not act "willfully" because his failure to comply with notice of alibi statute was not tactical, in bad faith or "designed to frustrate the truth-seeking function of the trial"), aff'd, 246 F.3d 93, 101 (2d Cir. 2001) (absence of good excuse is not commensurate with willful conduct), cert. denied, 534 U.S. 886 (2001).

Preclusion is generally appropriate only where there is a "tactically motivated willful violation" of a discovery rule or the matter is of a peripheral nature. See 4 LaFave et al., Criminal Procedure § 20.6(c) (2d ed. 1999); 7 New York Practice Series: New York Pretrial

34

Criminal Procedure § 7:24 ("The strictest sanctions, therefore, such as preclusion of testimony or other evidence in support of a defense, should be limited to cases in which the discovery violation was willful and motivated by a desire to obtain a tactical advantage."). Before imposing a preclusion sanction, a court must balance the state's need to control the orderly presentation of evidence at trial against the accused's fundamental right to present a defense. See Taylor, 484 U.S. at 414-15. In making this assessment, the court should consider the effectiveness of less severe sanctions, the impact of preclusion on the evidence at trial and the outcome of the case, the extent of prosecutorial surprise or prejudice, whether the violation was willful, and the simplicity of compliance with the discovery rule. See id. at 415 & n.19. Where prejudice to the prosecution can be minimized with relative ease, preclusion is an inappropriate sanction in the absence of some degree of "willfulness" and bad faith. Taylor, 484 U.S. at 414-15, 417; Noble v. Kelly, 246 F.3d 93, 100 n.3. (2d Cir. 2001). Sanctions other than preclusion are "adequate and appropriate in most cases." Taylor, 484 U.S. at 413; see also Rock v. Arkansas, 483 U.S. 44, 56 (1987) (restrictions on the right to present relevant testimony may not be "arbitrary or disproportionate to the purpose they are designed to serve").

Although Taylor specifically concerned preclusion of defense witnesses as a sanction for defendant's failure to respond properly to a pretrial discovery request, its holding has been applied broadly to a variety of discovery sanctions, including preclusion of expert witnesses. See, e.g., Noble, 246 F.3d at 96 (failure to comply with notice of alibi provision); Michigan v. Lucas, 500 U.S. 145, 149 (1991) (failure to comply with notice provision of state rape shield laws); People v. Oakes, 168 A.D.2d 893 (4th Dept. 1990) (applying Taylor to § 250.10); cf. Agard v. Portuondo, 117 F.3d 696, 705 (2d Cir. 1997) (Sixth Amendment violation to restrict

expert testimony), rev'd on other grounds, 529 U.S. 61 (2000).

New York Criminal Procedure Law § 250.10 requires a defendant who intends to submit psychiatric evidence in her own defense to submit to a mental health examination by a psychologist or psychiatrist retained by the prosecution. If the defendant "willfully" refuses to cooperate with the prosecution's mental health expert, the court is authorized to preclude the introduction of testimony by the defendant's psychiatrist of psychologist. Id. Section 250.10 is derived from the New York Court of Appeals decision in Lee v. County Court of Erie County, 27 N.Y.2d 432, cert denied, 404 U.S. 823 (1971). It held that a defendant who invokes the Fifth Amendment privilege against self-incrimination and refuses to submit to a psychiatric examination by the prosecution's psychiatrist is subject to a preclusion sanction. The court in Lee did not consider the propriety of a preclusion sanction where as here, the defendant provides timely notice of her intent to present a psychiatric defense, submits to a psychiatric examination, and cooperates to the degree that the prosecution's psychiatrist is able to render an opinion based on a "thorough psychiatric examination and psychosocial evaluation." (Exhibit B at 5).

No case in New York, found by the court, has permitted the "extreme" sanction of preclusion in circumstances such as those of the instant case. No New York case, found by the court, has precluded psychiatric evidence where a defendant's ability to be fully "cooperative" was impeded by her psychiatric condition.

In accordance with the Supreme Court's view that preclusion is an "extreme" sanction, Taylor, 484 U.S. at 417 n.23, New York courts typically reserve preclusion – as demonstrated in the cases cited by the District Attorney and the Appellate Division – to cases where the defendant either outright refuses to submit to an examination by the prosecution's psychiatrist or fails to file

36

a timely notice of intent to offer psychiatric evidence, and thus prevents the prosecution from moving for an examination. See People v. Almonor, 93 N.Y.2d 571 (1999); People v. Segal, 54 N.Y.2d 58 (1981); People v. Berk, 88 N.Y.2d 257 (1996). Absent such contumacious and prejudicial conduct by a defendant, New York courts, in accordance with Taylor v. United States, will not order preclusion but rather some alternative sanction, particularly where, as here, the psychiatric testimony is vital to the defense. See, e.g. People v. Oakes, 168 A.D.2d 893 (4th Dept. 1990); People v. Burton, 156 A.D.2d 945 (4th Dept. 1989); People v. Holland, 173 Misc.2d 286 (County Ct. 1997).

The trial court precluded Dr. Ledray's testimony based on petitioner's admission that she was mistrustful of Drs. Berger and Ledray, and was untruthful with them. Neither the trial court, nor the Appellate Division analyzed the impact of petitioner's psychiatric condition on her conduct, which was vital to the issue of whether her untruths were "willful" and "motivated by a desire to obtain a tactical advantage." Taylor, 484 U.S. at 415. Neither court addressed the question of whether the District Attorney had sustained any prejudice as a result of petitioner's conduct or whether any such prejudice could have been minimized by alternative sanctions. By precluding Dr. Ledray's testimony without employing the balancing approach supported in Taylor, and without analyzing whether petitioner violated § 250.10 in bad faith or to gain a "tactical advantage," the court "applie[d] a rule that contradicts the governing law set forth" in Taylor. See Lockyer v. Andrade, 123 S.Ct. 1166, 1173 (2003) (internal quotation marks and citation omitted). The court's preclusion of Dr. Ledray's testimony was both "contrary to" and an "unreasonable" application of the Supreme Court's holding in Taylor. See 28 U.S.C. § 2254(d)(1).

Where, as here, the question of "willfulness" concerns a defendant's conduct during a psychiatric examination, common sense as well as a prudent desire to get at the truth dictates that this analysis take into account the impact of the defendant's psychiatric condition on her conduct. A defendant's mental condition may impede his or her efforts to cooperate in such an examination. It would be both illogical and unjust to preclude evidence of the defendant's psychiatric condition because the defendant manifested the symptoms of that psychiatric condition. See People v. Fratt, 146 Misc. 2d 77, 84 (Sup. Ct. 1989) (§ 250.10 "should be given a rational interpretation consistent with achieving its purpose and with justice and common sense"); United States v. Haywood, 155 F.3d 674, 676 (3d Cir. 1998) (psychiatrist found defendant incompetent, in part, because defendant could not cooperate and participate in his mental status examination); United States v. Hollis, 569 F.2d 199, 205 (3d Cir. 1977) ("it would be both basically unfair as well as contradictory to say that a defendant who claims he is incompetent should be presumed to have the mental capacity to show that he in fact is incompetent") (citations omitted); cf. Pate v. Robinson, 383 U.S. 375, 384 (1966) ("[I]t is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently 'waive' his right to have the court determine his capacity to stand trial.").

Statutes similar to § 250.10 in other jurisdictions make express this common sense standard. See Alaska Stat. § 12.47.070(d) ("If the [psychiatric] examination . . . cannot be conducted by reason of the unwillingness of the defendant to participate in it, the report shall so state and shall include, if possible, an opinion as to whether the unwillingness of the defendant was the result of mental disease or defect." (emphasis added); Ark. Code Ann. 5-2-305(c) (same); Haw. Rev. Stat. Ann. § 704-404(5) (same); Idaho Code § 18-211(6) (same); Minn. Stat.

Ann. 20.02(4) (same); Montana Code Ann. § 45-14-206(2) (same); N.J. Stat. Ann. § 2C:4-5(c)
(same); Or. Rev. Stat. § 161.365 (4) (same).

　　　Courts have consistently refused to sanction defendants whose failure to cooperate during
a psychiatric examinations is symptomatic of their psychiatric condition. See, e.g., State v.
Williams, 742 P.2d 1352 (Ariz. 1987). In Williams, the court held that where a defendant was
diagnosed with paranoid schizophrenia and refused to cooperate with the prosecution's
psychiatrist, the defendant's psychiatric testimony would not be precluded, particularly where the
prosecution's expert was not hindered from rendering a diagnosis but concluded that defendant's
uncooperativeness was evidence of malingering. Id. at 1355- 56; see also State v. Obstein, 247
A.2d 5, 11 (N.J. 1968) (when defendant seeks to present psychiatric evidence at trial, defendant
must "cooperate fully" with state's examining expert "unless, of course, he is unable to do so
because of a mental condition"), overruled on other grounds, 459 A.2d 641 (N.J. 1983); State v.
Whitlow, 210 A.2d 763, 775 (N.J. 1965) ("defendant should cooperate [during prosecution's
psychiatric examination] unless he lacks mental capacity to do so"); State v. Marion Probate
Court, 381 N.E.2d 1245, 1248 (Ind. 1978) (finding that court properly issued a contempt charge
in accordance with due process of law against person refusing to submit to psychiatric
examination because "conduct was willful and not a manifestation of mental illness for which he
was not responsible").

　　　A dissent by an eminent jurist in Lee v. County Court of Erie County, 27 N.Y.2d 432,
448-49, 318 N.Y.S.2d 705, 718-19, 267 N.E.2d 452, 461-62 (1971) (Breitel, J., dissenting),
noted the absurdity of attempting to evaluate the "willfulness" of a defendant's failure to
cooperate during a psychiatric examination. "The fact, amply demonstrated over the years, is

39

that a failure of a defendant who pleads insanity to refuse to co-operate <u>most often reflects an</u>
<u>even greater degree of insanity rather than less</u> . . . . [N]<u>onco-operation may be evidence of</u>
<u>insanity just as much as it may be evidence of a feigned issue of insanity</u>." Id. (emphasis added).
The preclusion sanction is, in cases such as the present one, improper. The issue of a defendant's
failure to cooperate should be put to the jury, which would make the ultimate finding on the
credibility of a defendant's mental defect defense. Id.

A defendant whose psychiatric condition hinders her ability to cooperate, as a matter of
common sense and law, has acted neither "willfully" nor in bad faith to gain a tactical advantage.
In this case, the trial judge's conclusion that petitioner "willfully" failed to cooperate during her
psychiatric examinations because she did not trust Drs. Berger and Ledray, and was untruthful to
them about matters which she believed diminished the credibility of her rape claim, ignored the
wealth of psychiatric findings and reports that establish that such conduct is a classic symptom of
PTDS and TRS, and a "manifestation of mental illness for which [petitioner] was not
responsible." Marion Probate Court, 381 N.E.3d at 1248.

As Dr. Ledray concluded, petitioner suffered from "severe psychological problems,"
including PTSD and Major Depressive Disorder, that left her extremely defensive and distrustful
of others. As numerous studies of RTS have shown, rape victims, many of whom fear that their
claims of rape will not be believed, lie about their relationship to their attackers, and conceal
negative aspects of their personal history which they believe will diminish their credibility.

Neither the trial court nor the Appellate Division questioned the reliability of Dr.
Ledray's opinion in light of petitioner's untruths. Dr. Ledray, who sat through petitioner's cross-
examination and observed her admit to her untruths, remained prepared to testify that those

40

untruths to the mental health experts were consistent with that of a rape victim suffering from RTS and PTSD. (Tr. 1468-69).

In her June 15, 1997 letter, following petitioner's conviction, Dr. Ledray stood by her initial diagnosis. In that letter, Dr. Ledray noted that it is "common for victims to withhold information because they fear, rightly so, that others will judge them and not believe they were raped if they know certain information, such as that they had consenting sex with the assailant in the past." According to Dr. Ledray, "[e]ven if Keila has minimized the extent of her sexual relationship with Imagio . . . it would certainly not lessen the impact of the rape on Keila or the fact that she suffered PTSD and Rape Trauma Syndrome, or that she would fear him in the future."

The prosecution bore the burden of demonstrating that petitioner's untruths were prejudicial. See Ronson v. Commissioner of Correction, 463 F.Supp. 97, 103 (S.D.N.Y. 1987), aff'd, 604 F.2d 176 (2d Cir. 1979). No such showing was made. Neither the trial court, nor the Appellate Division, analyzed this issue.

The District Attorney argues that petitioner's untruths were prejudicial because they undermined the reliability of Dr. Berger's report and rendered it "worthless." This argument is not persuasive. Dr. Berger, as his report makes clear, believed that petitioner was untruthful during the examination and this belief was the basis for his diagnosis that she was "malingering" and feigning a mental disease. (See Exhibit B at 22). In his report, he concluded specifically that she had lied about her sexual relationship with Imagio, and also questioned her truthfulness with respect to her drug use and her conduct after the rape, particularly given, as Dr. Berger noted, that she had not been truthful with the police initially. (Id. at 7-10, 14). Thus, given Dr. Berger's

41

belief that she was exaggerating her symptoms and the suspicion that she was not being fully forthcoming (id. at 7, 16), any additional confirmation he received during petitioner's cross-examination that she had been untruthful during the examination, would have supported, not detracted from, his diagnosis.

Even assuming, arguendo, that the District Attorney was somehow prejudiced by petitioner's untruths, such prejudice to the District Attorney could have been alleviated by granting Dr. Berger an opportunity to revise his diagnosis, or if necessary, by granting a short continuance to allow Dr. Berger an opportunity to further question petitioner. See Taylor, 484 U.S. at 413 ("alternative sanctions are adequate and appropriate in most cases"); Rouson v. Commissioner of Correction, 604 F.2d 176, 179 (2d Cir. 1979). Any prejudice could have also been minimized by permitting Dr. Berger to testify to petitioner's untruths, allowing liberal cross-examination of Dr. Ledray or specifically instructing the jury that it should take petitioner's untruths into account in evaluating her's and Dr. Ledray's credibility. See Taylor, 75 N.Y.2d, at 291 (1990) (favorably citing a case for the proposition that "any flaws present in the expert testimony go to the weight to be given the evidence rather than its admissibility and can be the subject of cross-examination of the expert witness" (alternations, internal quotation marks and citation omitted); White, The Psychiatric Examination and the Fifth Amendment Privilege in Capital Cases, 74 J. Crim. L. & Criminology 943, 986-87 (September 1983) (allowing the prosecution's expert to testify about the defendant's failure to cooperate is ordinarily a sufficient sanction).

Petititioner's Sixth Amendment right to present Dr. Ledray's testimony far outweighed any theoretical prejudice sustained by the prosecution. The preclusion sanction was

42

constitutionally disproportionate to petitioner's purported violation of § 250.10. Taylor, 484 U.S. at 414-15.

The prosecution had no tactical basis or reason for waiting to make its motion until the conclusion of petitioner's cross-examination, which was near the close of trial. It should have raised this issue with the trial court well before the trial began, and, in any event, no later than immediately after the defense's opening statement, in which the defense admitted that petitioner was untruthful to the mental health experts. Had the prosecution raised this issue in a timely fashion, a hearing could have determined the extent of petitioner's failure to cooperate, and the defense would have had an opportunity to adjust its defense in response to an adverse ruling. Instead, by allowing the defense to proceed through nearly two weeks of trial testimony in reliance on the Court's February 26 Decision and its belief that Dr. Ledray would testify, the prosecution effectively "sand-bagged" the defense. Such sharp tactics on a critical issue in a case where life imprisonment or freedom was at stake dip far below acceptable standards of due process.

By failing to analyze the impact of petitioner's psychiatric condition on her conduct during her examinations, by failing to consider whether her actions were in bad faith and motivated by a desire to obtain a tactical advantage, and by failing to balance her Sixth Amendment right against any theoretical prejudice to the state, the trial court applied an analysis that was "contrary to" the Supreme Court's decision in Taylor.

When a defendant's constitutional rights have been violated due to trial error, habeas relief is warranted if the error had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 631 (1993) (quoting Kotteakos v.

43

United States, 328 U.S. 750, 776 (1946)); Wray v. Johnson, 202 F.3d 515, 525 (2d Cir. 2000).
Here, the preclusion of Dr. Ledray's testimony was not harmless. It eviscerated petitioner's
defense. It made conviction based on misconceptions by the jury inevitable.

Courts are divided on the issue of whether Brecht's harmless error standard applies only
to cases where a state appellate court has already applied the less deferential harmless error
standard articulated in Chapman v. California, 386 U.S. 18 (1967), which is typically applied on
direct review. See Orndorff v. Lockhart, 998 F.2d 1426, 1429-30 (8th Cir. 1993), cert. denied,
511 U.S. 1060 (1994); Lyons v. Johnson, 912 F. Supp. 679, 687-89 (S.D.N.Y.), aff'd, 99 F.3d
499 (2d Cir. 1996). The court need not decide this issue since the trial court's exclusion of Dr.
Ledray's testimony is not harmless even under the more deferential Brecht or any possible
standard.

The essence of petitioner's defense at trial was that on the night she shot Imagio Santana,
her childhood friend, she was attempting to seek from him an explanation as to why he had raped
her several days before. During their conversation, the jury could have found that Imagio reacted
violently and threatened to rape her again. (Tr. 1183). When Imagio ignored petitioner's
warnings to stay away from her, she shot him. (Id.)

The prosecution presented no direct evidence contradicting any of petitioner's testimony.
Her testimony was corroborated by the discovery of a folding knife, with the blade in the open
position, ready for use, near Imagio's body. There were drugs in one of Imagio's hands when the
police found him and an autopsy revealed that Imagio had used drugs shortly before his death.
(Tr. 105-06, 142-44, 501, 537, 873). There was also testimony at trial indicating that Imagio had
previously raped a fourteen year old girl. (Tr. 996). Given this evidence corroborating

44

petitioner's account of the shooting, her lack of any history of violent conduct, her close relationship to the Santana family, and Imagio's checkered past and prior violent conduct towards petitioner and others, the defense, on these historical facts, presented a significant issue as to whether petitioner was guilty of intentional murder.

In light of petitioner's impaired mental condition on the night of the shooting, she sought to present to the jury the defenses of mental disease or defect (N.Y. Penal Law § 40.15), extreme emotional disturbance, and justification (N.Y. Penal Law § 35.15). Each of these defenses relied on proof that petitioner was suffering from PTSD at the time of the shooting, to which Dr. Ledray was prepared to testify. When Dr. Ledray's testimony concerning PTSD was entirely precluded, all three of petitioner's defenses were fatally undermined.

"Courts . . . must consider the facts of the individual case in evaluating the Government's interest [and procedures] in prosecution" when it is dealing with a person claiming mental illness. Sell v. United States, 156 L.Ed2d 197, 212, 123 S. Ct. 2174, 2184 (2003) (administration of drugs to patient claiming mental illness so he can be tried). Here the state courts severely inhibited a defense by unconstitutionally preventing the jury from learning that a person in petitioner's position might lie because the rape itself causes her to lie.


X. Conclusion

The petition for a writ of habeas corpus is granted. Petitioner is to be released unless state criminal proceedings are commenced against petitioner within sixty days. This judgment is stayed until appeals are completed.

45

SO ORDERED.

Jack B. Weinstein
Senior District Judge

Dated:       October 30, 2003
             Brooklyn, New York